IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KAREEM HASSAN MILHOUSE,          :
                                 :
          Plaintiff              :          CIVIL NO. 1:CV-10-00135
                                 :
     v.                          :          (Judge Rambo)
                                 :
MARK J. PEORIA, *et al.*,         :
                                 :
          Defendants             :

# M E M O R A N D U M

On January 20, 2010, Plaintiff Kareem Hassan Milhouse ("Milhouse"), an

inmate currently confined at the United States Penitentiary in Lewisburg,

Pennsylvania ("USP-Lewisburg"), filed this *Bivens*[1]-styled complaint against three

USP-Lewisburg officials[2] (collectively, "Defendants"). (Doc. 1.) Milhouse alleges

that all Defendants have been deliberately indifferent to his serious medical needs

while he has been incarcerated at USP-Lewisburg since April 2009.

---

[1]   *Bivens* actions are the federal counterpart to § 1983 claims brought against state
officials. *Egervary v. Young*, 366 F.3d 238, 246 (3d Cir. 2004) (citing *Brown v. Philip
Morris, Inc.*, 250 F.3d 789, 800 (3d Cir. 2001)). "[C]ourts have generally relied upon the
principles developed in the case law applying section 1983 to establish the outer perimeters
of a *Bivens* claim against federal officials." *Schrob v. Catterson*, 948 F.2d 1402, 1409 (3d Cir.
1991).

[2]   Named as Defendants are B.A. Bledsoe, Warden; Krista Rear, Associate Warden; and
Mark J. Peoria, Physician's Assistant ("PA").

Before the court is a motion to dismiss and for summary judgment filed on behalf of Defendants. (Doc. 13.) For the reasons set forth below, the motion for summary judgment will be granted.

## I.    **Background**

### A.    **Facts**

Milhouse was initially incarcerated at USP-Lewisburg from April 8, 2008 through December 2, 2008. (Doc. 15 ¶ 1.) On December 2, 2008, Milhouse was transferred to the United States Penitentiary at Canaan in Waymart, Pennsylvania. (*Id*. ¶ 2.) However, on April 2, 2009, he was transferred back to USP-Lewisburg in order to participate in the Special Management Unit ("SMU") program. (*Id*. ¶ 3.) Although Milhouse does not reference any specific dates in his complaint, it appears that he is generally averring that the overall treatment he received at USP-Lewisburg for his various medical conditions since his return in April 2009 has been inadequate.

Defendants assert that Milhouse has filed at least 90 inmate requests to staff member ("cop-outs") to USP-Lewisburg's medical department and over 300 requests for administrative remedy within the nine months preceding the filing of their statement of material facts. (*Id*. ¶ 7.) Their statement of material facts references many of Milhouse's cop-outs and medical staff evaluation notes over that time

period.[3]  In his opposition to the instant motion, Milhouse attaches as exhibits a number of his cop-outs and requests for administrative remedy.  (*See* Docs. 18, 33, 35, 44, 46, 54, 55.)  For purposes of disposition of the instant motion, the court will first set forth Defendants' account of USP-Lewisburg medical staff's efforts to address Milhouse's medical complaints, as well as any additional or disputed records filed by Milhouse in opposition to the motion.  Following this recitation of facts, the court will set forth Milhouse's account of his filing of requests for administrative remedy.  However, the court initially notes that Defendants generally assert that Milhouse has been seen by Defendant PA Peoria almost on a daily basis, and continues to be medically evaluated and treated on a consistent basis by the institution's medical staff.  (*Id*. ¶¶ 8-9.)  In his counter statement of material facts, Milhouse asserts that, instead, PA Peoria is attempting to kill him by failing to provide medical attention.  (Doc. 16 ¶ 20.)

### i.    <u>Cop-Outs</u>

On July 1, 2009, Milhouse submitted a cop-out with complaints of blood in his stool and requested prednisone, pain medication, and an inhaler.  (Doc. 15 ¶¶ 12, 13; Doc. 14-5 at 40-41.)  After assessing Milhouse, PA Peoria submitted a consultation

---

[3]  Defendants have submitted the declaration of PA Peoria which verifies the accuracy of the cop-outs and medical staff evaluation notes with respect to Milhouse.  (Doc. 14-2 at 3-15.)

request for a colonoscopy due to Milhouse's rectal bleeding with abdominal pain. (Doc. 14-5 at 41.) He prescribed an inhaler and Naproxen for an unspecified backache, and told Milhouse to follow up at sick call as needed. (*Id*.)

On July 2, 2009, Milhouse submitted a cop-out with a complaint that he has not yet received high blood pressure medicine and requested allergy tablets. (Doc. 15 ¶ 14; Doc. 14-5 at 38-39.) It was noted that Milhouse has benign essential hypertension and allergic rhinitis. (Doc. 14-5 at 38.) PA Peoria issued the allergy tablets, but informed Milhouse that he had not been prescribed high blood pressure medication. (*Id*.) He also noted that Milhouse should follow up at sick call and the chronic care clinic as needed. (*Id*.)

On July 9, 2009, Milhouse submitted a cop-out requesting high blood pressure medication. (Doc. 15 ¶ 15; Doc. 14-5 at 36-37.) In response, he was again reminded that he had not been prescribed anti-hypertensives. (Doc. 14-5 at 36.)

On July 10, 2009, Milhouse submitted a cop-out requesting a refill of prednisone and allergy tablets. (Doc. 14-5 at 34-35.) PA Peoria issued the prescriptions and instructed Milhouse to follow up at sick call as needed. (*Id*.) Later that same day, Milhouse submitted another cop-out with a number of complaints, including chest pain, extremities pain, and pain from a use of force incident. (Doc. 15

4

¶ 16; Doc. 14-5 at 32-33.) He was seen at his cell and assessed for depressive disorder and antisocial personality disorder. (Doc. 14-5 at 32-33.) PA Peoria further noted the following: "I informed patient that I would not be addressing any of his multiple somatic complaints. Patient is extremely time intensive, is anxious, and dwells on somatic symptoms. He presents to Health Services almost daily. I do not see this changing."[4] (*Id*. at 33.)

On July 15, 2009, Milhouse was seen by PA Hemphill for complaints of a twisted ankle and swollen right arm. (Doc. 15 ¶ 18; Doc. 14-5 at 30-31.) He also requested antacid medication and denied any chest pain. (Doc. 14-5 at 30.) PA Hemphill prescribed Ibuprofen for the ankle and arm pain and antacid tablets. (*Id*. at 31.) Milhouse was advised that he should expect tenderness in the ankle for up to 30 days. (*Id*.)

On July 17, 2009, Milhouse was prescribed medication for stomach discomfort, per his request of the same day. (Doc. 15 ¶ 19; Doc. 14-5 at 28-29.)

On July 21, 2009, Milhouse submitted a cop-out with complaints of stomach pains, blood in his stool, swollen ankle, insomnia, chest pain, and racing thoughts. (Doc. 15 ¶ 20; Doc. 14-5 at 26-27.) In his report, PA Peoria noted that Milhouse does

---

[4] In his counter statement of material facts, Milhouse states, "Milhouse has serious documented medical conditions and does not dwell on symptoms but pain." (Doc. 16 ¶ 17.)

5

not want to see him because he thinks PA Peoria is trying to kill him. (Doc. 14-5 at 26.) Milhouse was assessed for external hemorrhoids, depressive disorder, antisocial personality disorder, a sprain and strain of an unspecified site of the ankle, heartburn, insomnia, ulcerative colitis, internal hemorrhoids, abdominal pain, and chest pain. (*Id*. at 26-27.) He was advised to follow up at sick call or the chronic care clinic as needed. (*Id*. at 27.) Further, he was informed that he may see a different provider at the time of his next chronic care clinic visit. (*Id*.) In his counter statement of material facts, Milhouse asserts that he was neither treated for depressive order nor informed that he could see a different provider. (Doc. 16 ¶¶ 21, 22.)

On July 23, 2009, Milhouse was seen for complaints of asthma, and prescribed an inhaler. (Doc. 14-5 at 25.) Also on July 23, 2009, PA Peoria addressed two cop-outs sent by Milhouse on July 14 and 20, 2009, respectively. (Doc. 15 ¶¶ 23, 24; Doc. 14-5 at 23-24.) In the cop-out dated July 14, 2009, Milhouse requested a blood pressure reading and various medications, including blood pressure medicine and prednisone. (Doc. 14-5 at 23.) In the cop-out dated July 20, 2009, Milhouse complained of blood in his stool and dizziness. (*Id*.) He requested a chronic care clinic visit and various medications, including lisinopril, an inhaler, prednisone, and allergy tablets. (*Id*.) He was assessed for benign essential hypertension, external

hemorrhoids, asthma, antisocial personality disorder, ulcerative colitis, internal

hemorrhoids, and allergic rhinitis. (*Id*. at 24.) Milhouse was advised to follow up at

sick call or the chronic care clinic as needed, and was discharged to the housing unit

with asthma restrictions. (*Id*.) He was also informed that he could pursue a

prescription of lisinopril at the time of his chronic care clinic visit. (*Id*.) It was noted

that he was not on any anti-hypertensives, and that his prescriptions for an inhaler and

prednisone had been filled the previous day. (*Id*.)

On August 3, 2009, PA Peoria addressed two cop-outs sent by Milhouse, one

with no date and the other dated August 1, 2009. (Doc. 15 ¶ 25; Doc. 14-5 at 21-22.)

In these cop-outs, Milhouse complained of continued ankle pain, and requested more

prednisone and pain medication. (*Id*. at 21.) He was assessed for a sprain and strain

of an unspecified site of the ankle and for ulcerative colitis. (*Id*.) Further, he was

prescribed Ibuprofen, but informed that the prescription for prednisone will not be

refilled so frequently. (*Id*. at 22.) He was also told to follow up at sick call or the

chronic care clinic as needed. (*Id*.)

On August 5, 2009, PA Peoria addressed a cop-out sent by Milhouse on August

4, 2009. (Doc. 15 ¶ 26; Doc. 14-5 at 19-20.) Milhouse was assessed for asthma and

allergic rhinitis. (Doc. 14-5 at 19.) His prescription for an inhaler was renewed, and he was told to follow up at sick call or the chronic care clinic as needed. (*Id.*)

On August 10, 2009, PA Peoria addressed a cop-out sent by Milhouse on August 9, 2009. (Doc. 15 ¶ 27; Doc. 14-5 at 17-18.) In the cop-out, Milhouse complained of continued ankle pain. (Doc. 14-5 at 17.) He also requested allergy tablets and prednisone. (*Id.*) It was noted that his soft shoe request was pending. (*Id.*) In addition, he was assessed for ulcerative colitis and allergic rhinitis. (*Id.*) He was told to follow up at sick call or the chronic care clinic as needed. (*Id.*)

On August 17, 2009, PA Peoria addressed a cop-out sent by Milhouse on August 13, 2009. (Doc. 15 ¶ 28; Doc. 14-5 at 15-16.) In the cop-out, Milhouse requested prednisone and pain medication for his back and ankle. (Doc. 14-5 at 15.) He was assessed for a backache, a sprain and strain of an unspecified site of the ankle, and ulcerative colitis. (*Id*. at 15.) Ibuprofen was prescribed , but his request for prednisone was denied. (*Id.*)

On August 21, 2009, PA Peoria addressed a cop-out sent by Milhouse on August 20, 2009. (Doc. 15 ¶ 29; Doc. 14-5 at 13-14.) In the cop-out, Milhouse submitted a request for anti-fungal cream, foot drops for a toe nail fungus, and an x-ray for his left ankle. (Doc. 14-5 at 13.) Milhouse was seen at his cell, and PA Peoria

8

noted fungus in Milhouse's groin area and recorded that Milhouse had previously stepped in a hole in his cell in July 2009, was given an ace wrap, but claimed it has not helped. (*Id*.) PA Peoria prescribed cream for his fungus. (*Id*. at 14.)

On August 27, 2009, Milhouse was seen by a general surgeon for rectal bleeding. (Doc. 15 ¶ 31; Doc. 14-5 at 12.) The surgeon recommended a colonoscopy to rule out polyps, and, as a result, a consult for a colonoscopy was written. (Doc. 14-5 at 12.) However, after Milhouse wrote several cop-outs to staff indicating that he was refusing the colonoscopy because of government experiments,[5] PA Peoria presented him with a refusal form which he signed on November 17, 2009. (Doc. 14-3 at 39-40; Doc. 14-5 at 42-45.)

On August 31, 2009, PA Peoria addressed two cop-outs sent by Milhouse on August 21 and 24, 2009, respectively. (Doc. 15 ¶ 32; Doc. 14-5 at 8-11.) In the first cop-out, Milhouse requested a "soft-shoe pass for left ankle surgery." (Doc. 14-5 at 10.) PA Peoria noted that he would not issue a soft shoe pass to Milhouse because he was already wearing issued soft shoes. (*Id*.) In the second cop-out, Milhouse requested that "something be done immediately otherwise 'this is deliberate

---

[5] Milhouse stated that the colonoscopy was "nothing more than a ploy to implant a sophisticated intelligent device inside me. The government has attempted this previously by putting microchips inside my prescribed medication. I do not want nor is willing to participate in any government experiment." (Doc. 14-5 at 44.)

indifference of inadequate medical care.'" (Doc. 14-5 at 8.)  PA Peoria noted that he was interpreting the request as one for an examination and x-ray of his left ankle, as well as a soft shoe pass.  (*Id*.)  He noted that he would inform Milhouse that his concerns had been documented.  (*Id*.)

On September 10, 2009, Milhouse's prescriptions for anti-fungal cream and Ibuprofen were refilled.  (Doc. 15 ¶ 33; Doc. 14-5 at 6-7.)  In addition, the pharmacy was notified for an over-the-counter ("OTC") form for Milhouse's indigent status for prescriptions.  (Doc. 14-5 at 6.)

On September 14, 2009, PA Peoria addressed three cop-outs sent by Milhouse, two on September 10, 2009, and a third on September 12, 2009.  (Doc. 15 ¶¶ 34, 35; Doc. 14-5 at 2-4.)  In the first cop-out sent on September 10, 2009, Milhouse requested a refill of Ibuprofen and an inhaler.  (Doc. 14-5 at 2.)  In the second cop-out, Milhouse requested allergy tablets and stated that the Ibuprofen is not working.  (*Id*.)  PA Peoria noted that Milhouse was not indigent, refilled the prescription for Ibuprofen, and referred Milhouse to the commissary for the allergy tablets.  (*Id*. at 2-3.)  In the cop-out sent on September 12, 2009, Milhouse again requested an inhaler.  (*Id*. at 2.)  Further, in an administrative note generated on September 14, 2009, it was noted that Milhouse was seen by an optometrist on that date.  (*Id*. at 4.)

On September 15, 2009, PA Peoria addressed a cop-out sent by Milhouse on September 2, 2009. (Doc. 15 ¶ 36; Doc. 14-4 at 50; Doc. 14-5 at 1.) In the cop-out, Milhouse complained of pain in his ankle and rectal bleeding. (Doc. 14-4 at 50.) He was seen at his cell, where he also requested nasal spray. (*Id*.) A prescription for nasal spray was submitted and Milhouse was advised to follow-up at sick call as needed. (Doc. 14-5 at 1.)

On September 16, 2009, Milhouse submitted a request for more allergy tablets. Doc. 15 ¶ 37; Doc. 14-4 at 48-49.) It was noted that Milhouse is not indigent and therefore he was referred to the commissary for allergy tablets. (Doc. 14-4 at 48.)

On September 18, 2009, Milhouse was seen by Clinical Director Dr. Pigos for his left ankle pain. (Doc. 15 ¶¶ 38, 39; Doc. 14-4 at 45-47.) Milhouse stated that he had not yet been examined or treated for the left ankle pain. (Doc. 14-4 at 45.) His pain scale was marked at "2." (*Id*.) When asked if he had any other medical concerns at that time, Milhouse stated no. (*Id*.) Upon examination, it was noted that he had full range of motion, no swelling, and no deformities. (*Id*. at 46.)

On September 28, 2009, PA Peoria addressed four cop-outs sent by Milhouse sent in September 2009. (Doc. 15 ¶¶ 40, 41; Doc. 14-4 at 42-44.) In a cop-out dated September 19, 2009, Milhouse requested a refill of the anti-fungal cream. (Doc. 14-4

at 42.) PA Peoria noted that Milhouse was no longer indigent. (*Id*.) In a cop-out dated September 24, 2009, Milhouse requested high blood pressure medication and anti-fungal cream. (*Id*.) It was noted that Milhouse has no history of hypertension and the pharmacy does not have a record of prescriptions for anti-hypertensives for Milhouse. (*Id*.) In a cop-out dated September 25, 2009, Milhouse requested that his blood sugar and cholesterol be checked, requested allergy tablets and high blood pressure medication, and complained of pain in his left ankle and lower back. (*Id*.) It was noted that he has not previously been prescribed medication for his cholesterol. (*Id*.) In addition, it was noted that labs that were previously ordered by staff were refused by Milhouse. (*Id*.) Finally, it was noted that an x-ray of Milhouse's ankle was ordered on September 16, 2009. (*Id*.) In a cop-out dated September 27, 2009, Milhouse requested high blood pressure medication and allergy tablets. (*Id*. at 43.) In response to these cop-outs, PA Peoria noted that because Milhouse was no longer indigent he would refer Milhouse to the commissary for a refill of the anti-fungal cream and allergy tablets. (*Id*. at 44.) In addition, he noted that no lab work would be requested at that time because Milhouse had previously refused the requested labs. (*Id*. at 43-44.) Milhouse was informed to follow-up at sick call or the chronic care clinic as needed. (*Id*. at 43.)

On September 29, 2009, PA Peoria addressed a cop-out sent by Milhouse on September 28, 2009. (Doc. 15 ¶ 42; Doc. 14-4 at 40-41.) In the cop-out, Milhouse requested pain medication for pain in his ankle and right forearm. (Doc. 14-4 at 40.) It was noted that Milhouse was no longer indigent and resultantly he was referred to the commissary for medication refills. (*Id.*)

On September 30, 2009, PA Peoria addressed a cop-out sent by Milhouse on September 29, 2009. (Doc. 15 ¶ 43; Doc. 14-4 at 38-39.) In the cop-out, Milhouse requested high blood pressure medication and stated that his ankle was in pain. (Doc. 14-4 at 38.) PA Peoria noted that he was not prescribing anti-hypertensives for Milhouse, who is normotensive. (*Id.*) In addition, he informed Milhouse that he can purchase an analgesia from the commissary for his ankle pain. (*Id.*)

On October 2, 2009, PA Peoria addressed two cop-outs sent by Milhouse on September 30 and October 1, 2009, respectively. (Doc. 15 ¶ 44; Doc. 14-4 at 36-37.) In the cop-out dated September 30, 2009, Milhouse complained of chest pain. (Doc. 14-4 at 36.) In the cop-out dated October 1, 2009, Milhouse requested allergy tablets. (*Id.*) PA Peoria noted that he would refer Milhouse to the commissary for allergy tablets, and also advise him that he would not be working in the SMU the following week "so he may take a holiday from writing me daily cop-outs." (*Id.* at 37.)

On October 7, 2009, Milhouse stoppped Dan DeLeon, RN, during his rounds of the SMU and informed him that he had previously been on high blood pressure medication, but had no specific complaint at that time. (Doc. 15 ¶ 45; Doc. 14-4 at 33-34.) However, he was given a refill of his inhaler. (Doc. 14-4 at 34.)

On October 19, 2009, PA Peoria addressed four cop-outs sent by Milhouse in October 2009. (Doc. 15 ¶ 46; Doc. 14-4 at 29-32.) In the first one, undated, Milhouse requested pain medication and stated that he previously received Naproxen for a back injury. (Doc. 14-4 at 29.) In a cop-out dated October 15, 2009, Milhouse stated that his blood pressure was taken by a nurse on October 7, 2009, and it was high. (*Id*.) In a cop-out dated October 16, 2009, Milhouse complained of abdominal pain. (*Id*.) In a cop-out dated October 18, 2009, Milhouse requested high blood pressure medication and Naproxen for chronic back pain. (*Id*.) He was prescribed Naproxen for his backache and told to follow-up at sick call or the chronic care clinic as needed. (*Id*.) In addition, he was issued eyeglasses. (*Id*. at 31.)

On October 20, 2009, PA Peoria addressed two cop-outs sent by Milhouse on October 19 and 20, 2009, respectively. (Doc. 15 ¶ 47; Doc. 14-4 at 26-27.) In the cop-out dated October 19, 2009, Milhouse stated the following, as noted by PA Peoria: "Wants to know why HSU considers his guaranteed right to medical treatment

14

is a privilege. 'Justice will prevail and someone will answer.' Threatens to submit sick call requests for the next 100 years. 'So please continue to ignore the chronic conditions I seek relief from.'" (Doc. 14-4 at 26.) In the cop-out dated October 20, 2009, Milhouse requested Naproxen for his chronic back pain, but it was noted that the prescription had been refilled the previous day. (*Id*.)

On October 22, 2009, Milhouse sent a cop-out to Nurse DeLeon stating, "DeLeon, you took my blood pressure on 10-17-09 and it was high, you also said you would talk to Pigos. I still did not receive my medication. What the fuck is wrong with y'all. Please return." (Doc. 14-4 at 22.) Nurse DeLeon noted that Milhouse had previously been informed that he would have to be seen by a physician's assistant or physician to determine if blood pressure medication was necessary, but that in his regular visits with staff he voiced no particular complaints. (*Id*.)

Also on October 22, 2009, PA Peoria addressed three cop-outs sent by Milhouse on October 21 and 22, 2009. (Doc. 15 ¶ 48; Doc. 14-4 at 24-25.) In each of these cop-outs, Milhouse requested allergy tablets, blood pressure medication, or prednisone. (Doc. 14-4 at 24.) PA Peoria noted that he would again direct Milhouse to the commissary for allergy tablets. (*Id*.)

On October 23, 2009, Milhouse sent a cop-out requesting high blood pressure medication. (Doc. 15 ¶ 49.) PA Peoria noted that Milhouse had been sending that same request for months, and the issue had been addressed almost on a daily basis. (Doc. 14-4 at 20.) He also noted that he would not prescribe anti-hypertensives to Milhouse. (*Id*.)

Also on October 23, 2009, an injury assessment was completed due to a use of force incident which had occurred earlier that day. (Doc. 15 ¶¶ 49-51; Doc. 14-4 at 17-19.) PA Peoria visited Milhouse at his cell and noted that he easily jumped off the top bunk to engage him in conversation. (Doc. 14-4 at 17.) Milhouse complained of an ankle injury from July 2009. (*Id*.) He also complained that he gets dizzy because he has high blood pressure and institution medical staff will not put him on medication. (*Id*.) After examining Milhouse, PA Peoria informed him that he would not be prescribing anti-hypertensives. (*Id*. at 18.)

On October 26, 2009, PA Peoria addressed a cop-out sent by Milhouse on October 23, 2009. (Doc. 15 ¶ 52; Doc. 14-4 at 14-16.) In the cop-out, Milhouse claimed he was pushed into a wall of his cell, hitting his head and suffering a cut. (Doc. 14-4 at 14.) As a result, he requested medication for a headache. (*Id*.) PA

Peoria noted that he would refer Milhouse to the commissary for OTC analgesics.  (*Id*.)

On October 27, 2009, PA Peoria addressed a cop-out sent by Milhouse on October 24, 2009.  (Doc. 15 ¶ 53; Doc. 14-4 at 12-13.)  In the cop-out, Milhouse requested antibiotic ointment, pills for a headache, and an inhaler.  (Doc. 14-4 at 12.)  An inhaler was prescribed, and Milhouse was referred to the commissary for pain medication.  (*Id*.)

On October 29, 2009, PA Peoria addressed a cop-out sent by Milhouse on October 26, 2009.  (Doc. 15 ¶ 54; Doc. 14-4 at 10-11.)  In the cop-out, Milhouse requested allergy tablets and antacid pills.  (Doc. 14-4 at 10.)  PA Peoria noted again that Milhouse is not indigent and referred him to the commissary to purchase the medication.  (*Id*.)

On October 30, 2009, PA Peoria addressed a cop-out sent by Milhouse on October 28, 2009.  (Doc. 15 ¶ 55; Doc. 14-4 at 8-9.)  In the cop-out, Milhouse complained of a headache and a small cut.  (Doc. 14-4 at 8.)  PA Peoria did not treat Milhouse's complaints, but told him to follow-up at sick call or the chronic care clinic as needed.  (*Id*.)

On November 2, 2009, PA Peoria addressed two cop-outs sent by Milhouse on November 1 and 2, 2009, respectively.  (Doc. 15 ¶ 56; Doc. 14-4 at 6-7.)  In both cop-

outs, Milhouse requested pain pills for a headache. (Doc. 14-4 at 6.) PA Peoria advised Milhouse to purchase OTC analgesics from the commissary. (*Id.*)

On November 3, 2009, PA Peoria addressed seven cop-outs sent by Milhouse. (Doc. 15 ¶ 57; Doc. 14-4 at 4-5.) In a cop-out dated October 9, 2009, Milhouse requested pain medication for lower back and left ankle pain. (Doc. 14-4 at 4.) In a cop-out dated October 11, 2009, Milhouse requested a physical examination. (*Id.*) In a cop-out dated October 13, 2009, Milhouse provided a history of his hypertension, depression, high cholesterol, rectal bleeding, and requested treatment for all of these conditions. (*Id.*) He also requested pain medication. (*Id.*) In a cop-out dated October 14, 2009, Milhouse complained of rectal bleeding and stomach pains. (*Id.*) In the cop-out dated November 2, 2009, Milhouse requested Naproxen for chronic lower back and ankle pain. (*Id.*) He also complained of headaches. (*Id.*) In an undated cop-out, Milhouse requested a refill of AIDS medication. (*Id.*) In another undated cop-out, Milhouse complained of chronic back and ankle pain, and requested high blood pressure medication. (*Id.*) PA Peoria noted that he would document these requests in the medical department's computer system as duplicative and return them to Milhouse, as he believed Milhouse was keeping the cop-outs as evidence for a lawsuit against prison officials. (*Id.*)

18

On November 4, 2009, PA Peoria addressed a cop-out sent by Milhouse on November 3, 2009.  (Doc. 15 ¶ 58; Doc. 14-4 at 2-3.)  In the cop-out, Milhouse requested pain medication, and again he was referred to the commissary.  (Doc. 14-4 at 2.)

On November 5, 2009, PA Peoria addressed a cop-out sent by Milhouse on November 3, 2009.  (Doc. 15 ¶ 59; Doc. 14-4 at 1; Doc. 14-3 at 50.)  In the cop-out, Milhouse again requested high blood pressure medication and complained of chest pain.  (Doc. 14-3 at 50.)  PA Peoria noted that because Milhouse's requests are repetitive and sent on a daily basis, he documents them in the record, but rarely acts on them.  (*Id.*)

On November 6, 2009, PA Peoria addressed a cop-out sent by Milhouse on November 5, 2009.  (Doc. 15 ¶ 60; Doc. 14-3 at 48-49.)  In the cop-out, Milhouse requested nasal spray and pain medication.  (Doc. 14-3 at 48.)  In response, PA Peoria explained to Milhouse "that because of the repetitive nature of his daily s/c cop outs requiring the same daily response which he ignores, I will no longer be responding.  I will simply record his requests for documentation purposes only."  (*Id.*)

On November 9, 2009, PA Peoria addressed two cop-outs sent by Milhouse on November 6 and 9, 2009, respectively.  (Doc. 15 ¶ 61, 62; Doc. 14-3 at 46-47.)  In the

cop-out dated November 6, 2009, Milhouse complained of chronic back pain and "have been prescribed pain medication since Jan. 2007. My back is hurting." (Doc. 14-3 at 46.) In the cop-out dated November 9, 2009, he complained of extremely chapped and bleeding skin, and informed PA Peoria that his ace bandage had been confiscated during a cell shakedown. (*Id.*) In response, PA Peoria informed Milhouse the he may purchase medication from the commissary, that Health Services does not provide skin moisturizers, and that he would not replace the ace bandage. (*Id.*)

On November 16, 2009, PA Peoria addressed a cop-out sent by Milhouse on November 15, 2009, in which he again requested allergy tablets and pain medication. (Doc. 15 ¶ 63; Doc. 14-3 at 43-44.) PA Peoria again referred Milhouse to the commissary. (Doc. 14-3 at 43.)

On November 17, 2009, Milhouse was seen by a psychiatrist, Keith Tolan, M.D., in response to a cop-out sent by Milhouse in which he described a "large conspiracy against him." (Doc. 15 ¶ 66; Doc. 14-3 at 37-38.) Dr. Tolan noted that Milhouse presented as one malingering for an external gain. (Doc. 14-3 at 38.) He stated that there was no evidence to support the pathology proposed by Milhouse in his cop-outs, except for anti-personality disorder ("ASPD") malingering. (*Id.*) He also noted that in light of Milhouse's lack of convincing pathology, along with

potential adverse effects of anti-psychotic medications, he would not risk prescribing such medication.  (*Id*.)

From late November 2009 through early February 2010, Milhouse submitted numerous cop-outs with repetitive requests for medication, x-rays, and EKGs, and complaints of reflux, back pain, arm pain, wrist pain, chest pain, allergies.  (Doc. 15 ¶ 67; Doc. 14-3 at 1-34.)  His requests were denied or he was referred to the commissary.  (Doc. 14-3 at 1-34.)  In addition, he was instructed to follow-up with the chronic care clinic because he was abusing sick call.  (*Id*.)

On February 5, 2010, PA Peoria addressed a cop-out sent by Milhouse on February 4, 2010.  (Doc. 14-2 at 48-49.)  In the cop-out, Milhouse claimed that he slipped in the shower and resultantly had pain in his right distal anterior antebrachium.  (*Id*. at 48.)  He was seen at his cell where his request for an x-ray was denied.  (*Id*.)  However, PA Peoria referred him to the commissary for pain medication.  (*Id*.)

On February 8, 2010, PA Peoria addressed three cop-outs sent by Milhouse on February 5, 7 and 8, 2010, respectively.  (Doc. 14-2 at 46.)  In the cop-outs dated February 5 and 7, 2010, Milhouse requested pain medication for his right arm due to the slip in the shower.  (*Id*.)  In the cop-out dated February 8, 2010, Milhouse requested allergy tablets and nasal spray.  (*Id*.)  PA Peoria noted that the issues

surrounding an injury to Milhouse's right arm had already been addressed on February 5, 2010, but referred Milhouse to the commissary for the requested medications. (*Id*.)

On February 9, 2010, PA Peoria addressed a cop-out sent by Milhouse on February 9, 2010, in which he again requested pain medication for his back and swollen wrist. (Doc. 14-2 at 44-45.) PA Peoria noted that Milhouse's wrist was not swollen and referred him again to the commissary for pain medications. (*Id*. at 44.) On February 10, 2010, Milhouse submitted the same request in a separate cop-out. (Doc. 14-2 at 42-43.) PA Peoria again referred him to the commissary. (*Id*. at 42.)

On February 12, 2010, Milhouse was prescribed Ibuprofen. (Doc. 15 ¶ 68; Doc. 14-2 at 41.)

On February 22, 2010, Milhouse was seen during a chronic care clinic with complaints of respiratory weakness, swelling in his wrist, and back pain. (Doc. 15 ¶ 69, 70; Doc. 14-2 at 33-40.) He also submitted a request for an x-ray of his back. (Doc. 14-2 at 33.) Upon examination, it was determined that there was no need for an x-ray of Milhouse's back. (*Id*. at 35.) Milhouse was instructed to do gentle stretching of his back and maintain optimum weight and strong abdominal muscles. (*Id*.)

On March 1, 2010, Milhouse sent a cop-out requesting pain medication.  (Doc. 15 ¶ 71; Doc. 14-2 at 31-32.)  PA Alama noted that pills were previously confiscated from Milhouse's cell, and Milhouse was required to purchase pain medication from the commissary.  (Doc. 14-2 at 31.)

On March 4, 2010, Milhouse sent a cop-out requesting a refill of antacid tablets for heartburn.  (Doc. 15 ¶ 72; Doc. 14-2 at 29-30.)  In response, calcium carbonate tablets were prescribed.  (Doc. 14-2 at 29.)

On March 15, 2010, Milhouse sent a cop-out requesting pain medication for back pain.  (Doc. 15 ¶ 73; Doc. 14-2 at 27-28.)  In response, Ibuprofen was prescribed. (Doc. 14-2 at 27.)

On March 26, 2010, Milhouse was seen by PA Geragi for chest pain, prostrate enlargement, and rectal pain with bleeding.  (Doc. 15 ¶ 74; Doc. 14-2 at 22-26.)  In response, he was prescribed suppositories and an x-ray of his chest was ordered. (Doc. 14-2 at 24.)  The results of the x-ray were negative.  (*Id.*)

On March 31, 2010, Milhouse was seen by PA Geragi for back pain.  (Doc. 15 ¶ 75; Doc. 14-2 at 19-21.)  Milhouse denied urinary symptoms, but requested pain medication.  (Doc. 14-2 at 19.)  In response, Ibuprofen was prescribed and Milhouse was instructed to do back stretches.  (*Id*. at 19-20.)

On April 2, 2010, PA Peoria addressed a cop-out sent by Milhouse on April 1, 2010.  (Doc. 15 ¶76; Doc. 14-2 at 17-18.)  In the cop-out, Milhouse requested a refill of his inhaler.  (Doc. 14-2 at 17.)  In response, the prescription for the inhaler was refilled.  (*Id*.)

On April 20, 2010, Milhouse sent a cop-out requesting a refill of pain medication and an x-ray of his back, and complaining of right arm and stomach pain and blood in his urine.  (Doc. 18 at 3.)  PA Zook responded that his refill would not be available until April 30, 2010.  (*Id*.)

On May 10, 2010, Milhouse sent a cop-out for a refill of pain medication and was prescribed acetaminophen and terazosin.  (Doc. 33 at 2-3.)  He received more acetaminophen on May 24, 2010.  (*Id*. at 1.)  On May 28, 2010, he requested that his blood pressure be taken.  (*Id*. at 4.)

On June 10, 2010, Milhouse was seen by PA Zook for chronic pain in his back and wrist and blood in his urine.  (Doc. 55 at 9-10.)  It was noted that recent x-rays showed sponylolisthesis and degenerative changes in his thoracic and cervical spine.  (*Id*. at 9.)  It was also noted that blood was found in his urine, and lab work and an ultrasound of his kidney, ureter, and bladder was ordered.  (*Id*.)  Acetaminophen was prescribed.  (*Id*.)

On June 17, 2010, Milhouse was seen by PA Zook in preparation for an appointment with the nephrologist, a physician specializing in kidney conditions. (*Id*. at 8.) It was noted that Milhouse had an abnormal urinalysis, multiple musculoskeletal complaints, microalbumin in his urine, and was responding well to lisinopril, a blood pressure medication. (*Id*.) PA Zook also indicated that he took Milhouse off his daily consumption of either Ibuprofen or Naproxen, which could be affecting his kidney function. (*Id*.)

On July 21, 2010, Milhouse sent a cop-out requesting nasal spray and pain medication. (Doc. 54 at 2.) In response, flunisolide and Ibuprofen were prescribed. (*Id*.) On July 28, 2010, Milhouse was prescribed amitriptyline. (Doc. 54 at 3.)

On August 12, 2010, PA Potter attempted to give Milhouse an amitriptyline tablet at his cell, but he refused to take it at that time due to his fasting for Ramadan. (Doc. 46 at 17.) PA Potter asked him to either take the pill at that time or return it, but he refused, placing it on the sink in his cell. (*Id*.) As a result, Milhouse's prescription was placed on hold. (*Id*.) The prescription was, however, renewed on September 16, 2010. (Doc. 46 at 8.)

On August 16, 2010, Milhouse had an ultrasound of his kidneys. (Doc. 44-2 at 1.) The results showed no significant abnormality. (*Id*.) In the nephrologist's report,

it was noted that Milhouse had developed a history of acute renal failure after a cocaine overdose. (Doc. 46 at 47.) However, as noted in an institution clinical evaluation dated September 2, 2010, the nephrologist recommended ordering "serum and urine electrophoresis, 24 hour urine total protein, pANCA, cANCA, complement levels and follow up in 3 months." (*Id*. at 11.)

On August 30, 2010, Milhouse's prescriptions for a nasal spray and Ibuprofen were refilled. (*Id*. at 15.)

On September 20, 2010, Milhouse was seen at the chronic care clinic for hypertension and chronic low back pain. (*Id*. at 4-7.) Refills of Milhouse's various medications were ordered. (*Id*. at 6.) Further, on September 23, 2010, lab tests, including blood tests and kidney function evaluations, were ordered. (*Id*. at 2-3.)

## ii. Requests for Administrative Remedy

In response to the instant motion, Milhouse has submitted the following exhibits relating to his requests for administrative remedy.

On May 11, 2009, Milhouse submitted a request with allegations of sexual harassment and inappropriate conduct by PA Peoria. (Doc. 18 at 61.) He asked that PA Peoria be disciplined and required to write an apology. (*Id.*) Warden Bledsoe denied the request. (*See id.* at 58.) Milhouse appealed the response, (*id.* at 57), and in a response dated August 21, 2009, the Regional Director denied the appeal, but stated that Milhouse's allegations were being investigated by the proper authorities, (*id.* at 58). Milhouse appealed this decision to the Central Office, (*id.* at 59), who responded that the matter was under investigation, (*id.* at 60).

On June 21, 2009, Milhouse submitted a request complaining that he was having difficulty sleeping and requesting sleep medication. (*Id.* at 63.) His request was denied by the Warden and the Regional Director. (*See id.* at 65.) On August 11, 2009, he appealed to the Central Office, (*id.* at 64), who denied the appeal, informing Milhouse that in accordance with BOP policy, medication for insomnia is not prescribed, (*id.* at 65).

On July 20, 2009, Milhouse submitted a request complaining that PA Peoria was not treating his new medical conditions. (Doc. 18 at 54.) He sought adequate medical attention and termination of PA Peoria. (*Id.*) Warden Bledsoe denied the request. (*See id.* at 53.) Milhouse appealed that response. (*Id.* at 52.) In a response

dated September 11, 2009, the Regional Director denied the appeal, noting that since January 2009 Milhouse had been evaluated by medical staff 35 times for various conditions and received appropriate treatment. (*Id*. at 53.) He also noted that Milhouse failed to present any evidence of inadequate medical care. (*Id*.)

On July 31, 2009, Milhouse appealed a denial of a request for administrative remedy claiming that he had a history of depression and medical staff is not properly treating it.[6] (*Id*. at 66.) In a response dated September 11, 2009, the Regional Director denied the appeal, noting that during Milhouse's previous visits to the health services department, he did not complain of depression or request medication for depression. (*Id*. at 67.) He instructed Milhouse to sign up to be evaluated by medical staff to determine if he needed depression medication. (*Id*.) Milhouse appealed that response, and in a response dated March 3, 2010, the Central Office denied the appeal, again instructing Milhouse to sign up with medical staff for evaluation. (*Id*. at 70.)

On September 14, 2009, Milhouse appealed a denial of a request for administrative remedy claiming that certain USP-Lewisburg staff had failed to respond to his cop-outs, and requesting a record of staff responses.[7] (*Id*. at 73.) In a

---

[6] The request for administrative remedy is not in the record.

[7] The request for administrative remedy is not in the record.

response dated October 21, 2009, the Regional Director denied the appeal, noting that between May and September staff had responded to his requests on eleven different occasions. (*Id*. at 74.) Milhouse appealed this response, (*id*. at 71), and in a response dated March 16, 2010, the Central Office denied the appeal, finding that the Warden and Regional Director had adequately addressed his concerns. (*Id*. at 72.)

On October 14, 2009, Milhouse submitted a request claiming that he heard another inmate tell staff that he was having difficulties and made a request for psychology services prior to committing suicide, but staff failed to respond during rounds. (*Id*. at 27.) As a result, Milhouse sought $500,000 for wrongful death. (*Id*.) In a response dated November 20, 2009, Warden Bledsoe informed Milhouse that for privacy reasons, staff cannot disclose to him any information about the psychological treatment of another inmate, but staff had indicated that they did make the proper rounds. (*Id*. at 28.) Milhouse appealed that response. (*Id*. at 25.) In a response dated December 28, 2009, the Regional Director denied the appeal, finding that the Warden had properly responded and that Milhouse had failed to provide any evidence that he was authorized to seek wrongful death damages on behalf of another inmate. (*Id*. at 26.)

On November 11, 2009, Milhouse submitted a request seeking pain medication and claiming he was being denied medical care. (*Id*. at 77.) Warden Bledsoe denied his request, finding that although Milhouse had previously been prescribed Naproxen, his clinician did not feel Naproxen was currently needed. (*Id*. at 78.) In addition, Warden Bledsoe instructed Milhouse to fill out an inmate request for OTC medication. (*Id*.) Milhouse appealed this response to both the Regional Director and the Central Office, who both denied it for administrative reasons. (*Id*. at 75, 85.)

On November 23, 2009, Milhouse submitted a request complaining that PA Peoria was not treating his medical conditions. (*Id*. at 51.) Warden Bledsoe reviewed Milhouse's medical records and determined that he was receiving appropriate medical treatment. (*See id*. at 50.) Milhouse appealed this response. (*Id*. at 49.) In a response dated January 15, 2010, the Regional Director denied the appeal, finding that Milhouse had been receiving appropriate medical treatment and that his allegations against medical staff were unsubstantiated. (*Id*. at 50.)

On December 1, 2009, Milhouse submitted a request complaining that medical staff scheduled him for a colonoscopy to address his rectal bleeding in order to implant an intelligence device inside him during the procedure. (*Id*. at 86.) Warden Bledsoe denied the request. (*See id*. at 56.) Milhouse appealed this response, adding

a request for criminal prosecutions.  (*Id*. at 55.)  In a response dated January 27, 2010, the Regional Director denied the appeal, noting that it was Milhouse who informed staff that he had blood in his stool and that medical staff recommended a colonoscopy in order to diagnose his condition.  (*Id*. at 56.)

On December 3, 2009, Milhouse submitted a request complaining that he had been denied a dental appointment on November 19, 2009 and requesting that the appointment be rescheduled.  (*Id*. at 39.)  In a response dated December 18, 2009, Warden Bledsoe informed Milhouse that the appointment had actually been scheduled for November 12, 2009, but that Milhouse refused it.  (*Id*. at 40.)  He also reminded Milhouse that the appointment was for routine care, and thus he would be added to the dental care waiting list again.  (*Id*.)  Milhouse appealed this response, adding that he had been denied medical attention in retaliation for filing requests for administrative remedy and complaints.  (*Id*. at 37.)  In a response dated January 27, 2010, the Regional Director denied the appeal, finding that Milhouse had refused the appointment but had been placed on the dental care waiting list again.  (*Id*. at 38.)  He also found that Milhouse's allegations against staff were unsubstantiated and without merit.  (*Id*.)

On December 14, 2009, Warden Bledsoe responded to one of Milhouse's requests for administrative remedy in which he requested pain medication and claimed that he was being denied medical care.[8] (*Id*. at 19.) Warden Bledsoe reviewed Milhouse's medical file and determined that Milhouse was receiving proper medications and medical care, and thus denied the request. (*Id*.)

On December 17, 2009, Milhouse submitted a request complaining that PA Peoria was refusing to provide him with medical attention and that he continues to write commissary on his sick call requests despite knowing that Milhouse is indigent. (*Id*. at 47.) In addition, he requested that PA Peoria be terminated. (*Id*.) In a response dated December 31, 2009, Warden Bledsoe denied the request, reminding Milhouse of his numerous OTC medications and his indigent status. (*Id*. at 48.) Milhouse appealed this response. (*Id*. at 45.) In a response dated February 9, 2010, the Regional Director denied the appeal, finding that Milhouse did not meet the criteria for an inmate without funds, and thus could purchase medication from the commissary. (*Id*. at 46.) In addition, he found that medical staff was providing appropriate medical treatment. (*Id*.)

---

[8] The request for administrative remedy is not in the record.

On December 19, 2009, Milhouse submitted a request to Associate Warden Rear complaining of inadequate medical care by PA Peoria. (*Id*. at 16-18.) He submitted a similar request to Associate Warden Rear on February 4, 2010. (*Id*. at 20.) In response, the warden directed Milhouse to address the issue with the Unit Team supervisor. (*Id*.)

On December 29, 2009, Milhouse submitted a request complaining that he was not receiving indigent medication and adequate medical care. (*Id*. at 23.) Warden Bledsoe responded on March 3, 2010, stating that Milhouse was only allowed two OTC items per week, and that he has received a full and thorough evaluation by medical staff at the chronic care clinic. (*Id*. at 24.) On March 4, 2010, Milhouse appealed that response. (*Id*. at 21.) In a response dated April 7, 2010, the Regional Director denied the appeal, reminding Milhouse that he received a deposit to his account on December 16, 2009, and thus when his OTC medication request was received on December 23, 2009, he was not indigent. (*Id*. at 22.) The Regional Director also found that there was no evidence to substantiate his claims about medical staff. (*Id*.)

On January 5, 2010, Milhouse submitted a request complaining that his anti-fungal cream was not dispensed to him in the original package and accusing PA

Peoria of trying to poison him. (*Id*. at 31.) In a response dated February 26, 2010,

Warden Bledsoe informed Milhouse that the medication would be dispensed to him

again in the original package. (*Id*. at 32.) Milhouse appealed that response. (*Id*. at

29.) In a response dated April 7, 2010, the Regional Director denied the appeal,

informing Milhouse that his OTC medication would be issued to him in the original

package and that his allegations against medical staff were unsubstantiated and

without merit. (*Id*. at 30.)

On January 7, 2010, Milhouse submitted a request complaining that he was not

receiving milk-of-magnesia despite requesting it. (*Id*. at 35.) In a response dated

March 3, 2010, Warden Bledsoe informed Milhouse that he could receive this OTC

medication when indigent; otherwise, he would have to purchase it through the

commissary. (*Id*. at 36.) In Milhouse's appeal of that response, he also requested that

PA Peoria be demoted or terminated. (*Id*. at 33.) In a response dated April 7, 2010,

the Regional Director denied the appeal, finding that the Warden's assessment of

Milhouse's indigent status was correct, and that Milhouse's allegations against

medical staff were unsubstantiated and without merit. (*Id*. at 34.)

On February 25, 2010, Milhouse submitted a request complaining that the

psychology staff at USP-Lewisburg had made several entries into his psychology file

to discredit his allegations against government officials. (*Id*. at 43.) He also requested that the psychology department supply him with a "thorough report of a clarification of the record" to present to the American Psychological Association. (*Id*.) In a response dated March 9, 2010, Warden Bledsoe denied the request, informing Milhouse that there was no evidence of entries made into his Psychology Data System ("PDS") record for purposes other than to document his mental health-related information. (*Id*. at 44.) Milhouse appealed that response, adding that staff was not providing adequate and effective care, and that the government "has attempted to destroy me." (*Id*. at 41.) In a response dated April 22, 2010, the Regional Director denied the appeal, finding that Milhouse had participated in more that 19 contacts with the psychology staff and that he has continued to be seen on a monthly basis. (*Id*. at 42.) As a result, his allegations of inadequate medical care were without merit. (*Id*.)

On April 29, 2010, Milhouse submitted a request complaining that his previous requests for administrative remedies and sick call requests had not been answered. (*Id*. at 2.) In response, the administrative remedy clerk stated that his Unit Team was working on informal resolution of his concerns. (*Id*.)

On May 13, 2010, Milhouse submitted a request complaining that he has not been receiving responses to his cop-outs relating to PA Peoria's sick call responses.

(Doc. 33 at 17.)  Warden Bledsoe denied the request on June 8, 2010, reminding

Milhouse that his requests had been submitted on the incorrect form and thus were not

accepted.  (*Id*. at 18.)  He also reminded Milhouse that he had been previously told to

re-submit his requests.  (*Id*.)

### B. <u>Procedural History</u>

Milhouse filed his complaint on January 20, 2010.  (Doc. 1.)  After waiving

service of the complaint, Defendants filed a motion to dismiss and for summary

judgment on April 30, 2010.  (Doc. 13.)  A supporting brief and statement of material

facts followed on May 3, 2010.  (Docs. 14, 15.)  Milhouse filed an answer to the

statement of material facts, a brief in opposition, a supplemental brief in opposition,

and numerous exhibits.  (Docs. 16-18, 24, 26, 31, 33, 35, 44, 46, 54-55.)  Both parties

also filed reply briefing.  (Docs. 29, 37.)  Thus, the motion is ripe for disposition.

## II. <u>Standards of Review</u>

### A. <u>Motion to Dismiss</u>

Defendants has filed a motion which, in part, seeks dismissal of the complaint

on the grounds that Milhouse's complaint fails to state a claim upon which relief can

be granted, as provided by Rule 12(b)(6) of the Federal Rules of Civil Procedure. The motion, however, goes beyond a simple motion to dismiss under Rule 12(b)(6) because it is accompanied by evidentiary documents outside the pleadings contravening Milhouse's claims. Rule 12(d) provides as follows:

> If, on a motion under Rule 12(b)(6) or (12)(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

Fed. R. Civ. P. 12(d). The court will not exclude the evidentiary materials accompanying Defendants' motion to dismiss because Milhouse has also been given a reasonable opportunity to present material relevant to the motion. Thus, Defendants' motion to dismiss and for summary judgment shall be treated solely as seeking summary judgment.

### B.    Motion for Summary Judgment

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R.

Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001).

A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id*. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "'Such

affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

## III.  Discussion

To demonstrate a *prima facie* case of Eighth Amendment cruel and unusual punishment based on the denial of medical care, a plaintiff must establish that the defendant acted with "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993).  There are two components to this standard: Initially, a plaintiff must make an "objective" showing that the deprivation was "sufficiently serious," or that the result of the defendant's denial was sufficiently serious.  Additionally, the plaintiff must make a "subjective" showing that the defendant acted with "a sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *see also Montgomery v. Pinchak*, 294 F.3d 492, 499 (3d Cir. 2002).[9]

_____

[9]  The "deliberate indifference to serious medical needs" standard is obviously met when pain is intentionally inflicted on a prisoner, where the denial of reasonable requests for medical treatment exposes the inmate to undue suffering or the threat of tangible residual injury, or when, despite a clear need for medical care, there is an intentional refusal to provide that care. *See Spruill*

This test "affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients. Courts will 'disavow any attempt to second guess the propriety or adequacy of a particular course of treatment . . . which remains a question of sound professional judgment." *Little v. Lycoming County*, 912 F. Supp. 809, 815 (M.D. Pa. 1996) (citing *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979), quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)).

When an inmate is provided with medical care and the dispute is over the adequacy of that care, an Eighth Amendment claim does not exist. *Nottingham v. Peoria*, 709 F. Supp. 542, 547 (M.D. Pa. 1988). Mere disagreement as to the proper medical treatment does not support an Eighth Amendment claim. *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987). Only flagrantly egregious acts or omissions can violate the standard. Medical negligence alone cannot result in an Eighth Amendment violation, nor can any disagreements over the professional judgment of a health care provider. *White v. Napolean*, 897 F.2d 103, 108-10 (3d Cir. 1990). *See also Estelle*, 429 U.S. at 105-06 (medical malpractice is insufficient basis upon which to establish an Eighth Amendment violation); *Rouse*

---

*v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (quoting *White v. Napolean*, 897 F.2d 103, 109 (3d Cir. 1990); *Monmouth Cnty Corr. Instutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987).

*v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) ("It is well-settled that claims of negligence and medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.'"); *Lanzaro*, 834 F.2d at 346 (mere allegations of malpractice do not raise issues of constitutional import).

In the instant case, throughout the relevant time period, Milhouse was seen on numerous occasions by medical staff at USP-Lewisburg for treatment of symptoms ranging from rectal bleeding to back pain. He was repeatedly evaluated and was prescribed medication to ease his discomfort. Diagnostic tests were ordered, and eventually performed, to facilitate treatment. The record reflects that medical staff was addressing Milhouse's medical concerns nearly every day during the relevant time period. In addition, BOP administration, including USP-Lewisburg's Warden, the Regional Director, and the Central Office, all addressed Milhouse's concerns. Unfortunately, despite all the medical intervention, Milhouse continued to suffer from discomfort. This is clearly a case where Milhouse has been given medical attention and is dissatisfied with the course of treatment and subsequent results. An inmate's disagreement with medical treatment is insufficient to establish deliberate indifference. *Durmer*, 991 F.2d at 69; *Spruill*, 372 F.3d at 235. Courts will not second guess whether a particular course of treatment is adequate or proper. *Parham*

41

*v. Johnson*, 126 F.3d 454, 458 n.7 (3d Cir. 1997). Moreover, there is nothing in the record demonstrating that any significant delay in treating Milhouse's medical conditions was deliberate or intentional on the part of any Defendant. In fact, Milhouse himself delayed his treatment in part by refusing certain procedures or medications. Under these circumstances and based upon the well-documented course of treatment set forth in the record, the court finds that Defendants were not deliberately indifferent to Milhouse's medical needs. Thus, Milhouse has failed to establish an Eighth Amendment violation. Defendants' motion for summary judgment will be granted.

An appropriate order follows.

s/Sylvia H. Rambo<br>
United States District Judge

Dated: November 22, 2010.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**KAREEM HASSAN MILHOUSE,**          :
                                     :
          **Plaintiff**              :          **CIVIL NO. 1:CV-10-00135**
                                     :
          **v.**                     :          **(Judge Rambo)**
                                     :
**MARK J. PEORIA,** *et al.*,        :
                                     :
          **Defendants**             :

## O R D E R

In accordance with the foregoing memorandum, **IT IS HEREBY ORDERED**

**THAT:**

1.  Defendants' motion for summary judgment (Doc. 13) is **GRANTED**.

2.  The Clerk of Court is directed to **ENTER** judgment in favor of Defendants

and against Plaintiff.

3.  The Clerk of Court is directed to **CLOSE** this case.

3.  Any appeal from this order is **DEEMED** frivolous and not in good faith.

*See* 28 U.S.C. § 1915(a)(3).

                                        s/Sylvia H. Rambo
                                        United States District Judge

Dated:  November 22, 2010.